266 F.Supp.2d 1014 (2003)
EASY RETURNS WORLDWIDE, INC., Plaintiff,
v.
The UNITED STATES of America, as represented by John Ashcroft, in his official capacity as Attorney General, John B. Brown III as Deputy Administrator for the Drug Enforcement Administration, Defendants.
No. 4:03 CV 555HEA.
United States District Court, E.D. Missouri, Eastern Division.
May 19, 2003.
Eric D. Martin, Blackwell, Sanders, Peper, Martin, LLP, St. Louis, MO, Stephen L. Hill, Jr., Blackwell, Sanders, Peper, Martin, LLP, Kansas City, MO, for plaintiff.
Joseph B. Moore, Suzanne J. Gau, Office of U.S. Attorney, St. Louis, MO, Ori Lev, U.S. Department of Justice, Washington, DC, for defendants.

MEMORANDUM AND ORDER
AUTREY, District Judge.
This matter is before the Court on the Plaintiffs Application for Preliminary Injunction. On May 14, 2003 and May 15, 2003, the Court held a hearing on this matter. Evidence was taken, and arguments were considered. Defendant has *1015 also filed a Motion to Dismiss. For the reasons set forth below, plaintiffs Motion for Preliminary Injunction, [# 1], is denied and the Motion to Dismiss, [# 27] is granted.

Statutory Requirements
Under the Controlled Substances Act, anyone who manufactures or distributes a controlled substance, must obtain a registration from the Attorney General on an annual basis. 21 U.S.C. § 822(a). The Attorney General "shall register an applicant to distribute a controlled substance... unless he determines that the issuance of such registration is inconsistent with the public interest." 21 U.S.C. § 823(b), (e).
Once the registration is issued, the Attorney General has the authority to revoke such registration if, inter alia, the registrant has committed acts "as would render his registration ... inconsistent with the public interest as determined under [Section 823]." 21 U.S.C. § 824(a)(4). An order to show cause why the registration should not be revoked is required to be is served upon the registrant in the event that the Attorney General intends to revoke the registration. 21 U.S.C. § 824(c); 21 C.F.R. 1301.37(c). The revocation becomes effective after an administrative hearing, if one is requested, and upon final order of the Administrator. See 21 C.F.R. § 1301.46.
The Attorney General can, in his discretion, suspend any registration simultaneously with the institution of proceedings under Section 824 where he finds that there is an imminent danger to the public health or safety. 21 U.S.C. § 824(d). The Attorney General must serve an order of immediate suspension which contains a statement of his findings regarding the danger to the public health and safety. 21 C.F.R. § 1301.36(e). In the event of such an immediate suspension, the registrant is entitled to an expedited administrative hearing. 21 C.F.R. § 1301.36(h). This suspension remains in force until the conclusion of the administrative proceeding unless "sooner withdrawn" by the Attorney General or dissolved by "a court of competent jurisdiction." 21 U.S.C. § 824(d).
The DEA requires registrants to maintain specific security requirements with respect to the storage and handling of controlled substances. 21 C.F.R. § 1301.71(a). The regulations set forth a set of factors for the Administrator to consider in determining whether a particular registrant's overall security system meets the "need for strict compliance with security requirements." 21 C.F.R. § 1301.71(b).
The regulations set forth specific required physical security controls that govern how controlled substances must be stored. 21 C.F.R. § 1301.72. All Schedule I and II controlled substances must be stored in either a safe or steel cabinet or a vault meeting certain detailed specifications. 21 C.F.R. § 1301.72(a). Schedule III, IV and V controlled substances can be stored in a safe, steel cabinet or vault, or in any one of several other specifically prescribed and secured facilities such as a steel cage meeting certain specifications. 21 C.F.R. § 1301.72(b). DEA regulations also require registrants to notify it of any theft or significant loss of any controlled substances upon discovery of such theft or loss, using its forms, whether or not the substances are subsequently recovered. 21 C.F.R. § 1301.74(c).
The CSA and its regulations also establish several record keeping and reporting requirements. 21 U.S.C. §§ 827, 828, 842(a)(5). Section 1304.21 requires each registrant to maintain on a current basis a complete and accurate record of each such *1016 substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of by the registrant. These records must contain specific prescribed information regarding the name of the substance, its finished form and the number of units at issue. 21 G.F.R. § 1304.22; 21 C.F.R. § 1304.21(d). An inventory of all stocks of controlled substances on hand is required at least every two years. The inventory must contain a complete and accurate record of all controlled substances on hand on the date the inventory is taken and must be maintained in written, typewritten or printed form at the registered location. 21 C.F.R. § 1304.11(a).
Registrants are also required to report records of sales or acquisitions of controlled substances in Schedules I and II, of narcotic controlled substances listed in Schedules III, TV and V, and of psychotropic controlled substances listed in Schedules III and IV with the DEA's Automation of Reports and Consolidated Orders System (ARCOS). 21 C.F.R. § 1304.33(c); 21 U.S.C. 827(d). These reports must be filed every quarter not later than the 15th day of the month succeeding the quarter for which it is submitted. 21 C.F.R. § 1304.33(b).
Under Section 842 of Title 21, it is unlawful to refuse or negligently fail to make, keep or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required by the CSA. Under Section 843, it is unlawful to furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept or filed under the CSA.

Facts and Background[1]
Plaintiff, Easy Returns Worldwide, Inc., (ERW), brought this action seeking a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure and the Administrative Procedures Act, APA, 5 U.S.C. § 702. Plaintiff seeks to enjoin defendant, United States of America, acting through the Drug Enforcement Administration, (DEA), from immediately suspending plaintiffs Registration to possess and distribute controlled substances. Defendant moves to dismiss the action. The Court entered a temporary restraining order on April 30, 2003, which dissolved the immediate suspension of plaintiff's DEA Registration, until the conclusion of the hearing on plaintiffs Application.
Plaintiff is a "reverse distributor" of pharmaceutical products including Schedule II through V controlled substances. Plaintiffs primary business activity is retrieval of outdated or short-dated stocks of pharmaceutical products for the purposes of collecting rebates or destroying the products for its clients. As such, ERW is required to register with the DEA.
ERW has two types of clients: off-site and on-site, in the latter instance, an employee or agent of ERW is on the customer's business site to assist with the collection and transfer of the pharmaceutical products, whereas in the former, the customer performs these functions and sends the products to ERW.
On April 24, 2003, the DEA issued its Show Cause Order and Immediate Suspension of ERWs Registration. This Order and Immediate Suspension was served on April 25, 2003 without prior notice or hearing. Plaintiff filed this action to enjoin the *1017 DEA from suspending its registration in this way.

Discussion
Preliminary injunctive relief functions to "preserve the status quo until, upon final hearing, a court may grant full, effective relief." Kansas City Southern Trans. Co., Inc. v. Teamsters Local Union #41, 126 F.3d 1059 (8th Cir.1997) (citations omitted). Whether the equitable remedy of a preliminary injunction should issue depends upon four factors:
(1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant should a preliminary injunction be denied; (3) the balance between this harm and the harm that granting the injunction will cause to the other parties litigant; and (4) the public interest.
Taylor Corp. v. Four Seasons Greetings, LLC 315 F.3d 1039, 1041 (8th Cir.2003)(citing Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 112-14 (8th Cir.1981))(en banc). See also, Safety-Kleen Systems, Inc. v. Hennkens 301 F.3d 931, 935 (8th Cir.2002). The Court considers all of the factors and decides whether "on balance, they weigh in towards granting the injunction." Dataphase, 640 F.2d at 113. The burden of establishing that preliminary relief is warranted is on the party seeking the injunction. Id.

A. Irreparable Harm
At the hearing,[2] plaintiff introduced the testimony of Jeffrey Jappa, plaintiffs CEO, to demonstrate the irreparable harm ERW would suffer if its registration was suspended pending the administrative hearing to review the DEA's Order to Show Cause and Immediate Suspension. Mr. Jappa testified that he assumed the position of CEO on November 1, 2003. ERW has approximately 100 employees throughout the country. About 50 percent of ERW's business is "off-site" and approximately 87 percent of its business packages received contain both controlled and noncontrolled substances. He further stated that the company receives "blind" packages, i.e., packages which do not indicate the contents contained therein. With respect to these packages, ERW would no longer be able to accept them without the registration because they may contain controlled substances and that without the registration, the company would be in violation of the law. Mr. Jappa testified that he contacted three of his primary customers and was advised that they would no longer be able to do business with ERW because of the need to ship controlled substances. He also stated that one of the vice presidents of the company contacted other customers and was advised of the same result.[3] Mr. Jappa also testified that he had pending contracts which were dependent upon the ability to accept controlled substances. Furthermore, according to his calculations, which he stated he himself conducted based on his background and experience, ERW would not be able to stay in business if it could not accept controlled substances. His testimony was that it would be impossible to contact all of his customers.
On cross examination, Mr. Jappa admitted that the company did not have a Chief Financial Officer nor that any documented *1018 analysis was completed. The only analysis completed was his own. He took no steps to inform customers of the DEA's suspension on the day the subpoena was issued. Furthermore, he sent an e-mail to the employees asking them to refrain from telling anyone that the DEA was present at the company. He also was trying to "negotiate" with the DEA to continue to accept controlled substances. When questioned about his individual analysis, Mr. Jappa stated that he did include some of the 87 percent of the customers that send both controlled substances and noncontrolled substances, and that he "surveyed" his large customers regarding whether they would continue to do business with ERW.
Based only on Mr. Jappa's testimony, the Court finds plaintiff has failed to set forth sufficient evidence to demonstrate irreparable harm. Mr. Jappa's testimony is nonexhaustive and is based solely on his "calculations" that ERW cannot reorganize its business to efficiently accept returns which would not involve controlled substances. No significant analysis was made with respect to the manner in which returns are accepted. For example, it appears that ERW did not analyze the increase of "on-site" business, nor explore the possibility of asking its customers to separate the controlled substances from the noncontrolled substances and with respect to the controlled substances, explore the possibility of entering into an arrangement with another company to temporarily accept the controlled substances. There was no documentation of the exact amount of business which involves controlled substances, nor was there any concrete evidence of the loss of business, loss of contracts or the amount of business which would be effected by the suspension order.
Because of the nature of the suspension order, plaintiff is entitled to an expedited hearing before the administrative law judge. This hearing has been scheduled to begin on June 16, 2003. Based only on the conclusory testimony of Mr. Jappa and plaintiffs failure to present any substantive, identifiable or concrete evidence, the Court finds plaintiff has failed to satisfy its burden of establishing irreparable harm without the issuance of the preliminary injunction.

B. Likelihood of Success on the Merits, the Balance Between Irreparable Harm and the Public Interest
Because plaintiff has failed to establish irreparable harm, there can be no balancing with the remaining factors to be considered in the determination of whether to issue a preliminary injunction. The Court, however, finds it significant to note that even assuming irreparable harm, the balance would still favor denying the preliminary injunction.
After hearing argument, the Court granted defendant's Motion in Limine to Limit the Scope of the Court's Review to the Administrative Record and to Consolidate the Preliminary Injunction Hearing with the Merits. Thus, the Court will address the remaining factors based on the Administrative Record. Under the Controlled Substances Act, the Attorney General, in his discretion, may issue the immediate suspension simultaneously with the institution of administrative proceedings under Section 824 of Title 21 in cases where there is an imminent danger to the public health or safety. The Administrative Record establishes that the decision to immediately suspend the registration was supported by the threat of imminent danger to the public health or safety. The Order to Show Cause and Immediate Suspension establishes the following.
In August, 2001, the DEA began a scheduled regulatory investigation of plaintiff.[4] *1019 During this investigation, a series of record keeping problems were revealed. Specifically, DEA investigators found the following regulatory violations:
failures to indicate close of business or beginning of business and the finished form of the controlled substance on the biennial inventory;
failure to indicate the date of acquisition, number of units acquired and finished form of controlled substances on certain records;
failure to complete DEA-106 forms to report significant theft or loss of controlled substances;
failure to maintain legible order forms (DEA Form 222);
failure to have a power of attorney on file for order forms;
failure to have original signatures on destruction records; and
failure to submit any ARCOS reports since June, 1999.
See, Order to Show Cause [and] Immediate Suspension of Registration, ¶¶ 11-13.
DEA investigators also identified a number of security procedure weaknesses including the failure to track DEA-222 order forms, lax procedures regarding the placement and sealing of controlled substances within ERW's controlled substances cage and access to the controlled substances cage, a malfunctioning alarm system, overly-generous access to the controlled substances cage, and infrequent searches of employees. Order, ¶ 14. There was also a problem that the receiving personnel sometimes failed to identify controlled substances in orders so that they were stored in the general warehouse until they were discovered by general processors. March Report of Investigation, (ROL), attachment 23, p. 19. At the closing discussion of the investigation on August 24, 2001, these issues were discussed with ERW's management. Order, ¶¶ 13-14. Although management agreed to submit all past due ARCOS by October 31, 2001, ERW did not begin to submit reports until December, 2002. Order, ¶ 13.
The same day as the closing discussion, DEA investigators received an anonymous call urging the DEA to continue further investigation. March ROL, ¶ 37. This call prompted the on-going investigation which culminated in the issuance of the Immediate Suspension Order. March ROL, ¶ 37-92.; April ROL.
During the course of the investigation, new information was obtained:
In September, 2001, an ERW employee was arrested for diverting controlled substances and listed chemicals, an arrest which led to the employee's guilty plea on drug related charges, as well as similar guilty pleas from two of his customers;
ERW employees were instructed to make a "good guess" regarding missing data to be included on certain ARCOS reports and otherwise manipulated data; ERW employees may have fabricated records;
ERW employees did not know how to properly recognize controlled substances in shipments received by ERW; An ERW employee brought a third party into the pharmacy while conducting an inventory, 30 packets of injectable codeine were later found to be missing, and ERW management had been aware of the incident but failed to inform DEA of it during the administrative inspection;
Numerous ERW customers complained about improper crediting of their orders and ERW employees were instructed to *1020 make changes to computer transactions of controlled substances to resolve such complaints;
An ERW employee died of an apparent overdose while out of town on ERW business;
ERW employees had access to prescription drugs and regularly diverted controlled substances and other drugs, sometimes for personal or family use;
ERW made up discrepancies in customer orders by skimming controlled substances from other orders, held "warehouse sales" where employees could purchase products sent to ERW, and maintained a "slush fund" of drugs for this and other purposes;
ERW maintained generally lax record keeping and security procedures resulting in numerous errors; and
ERW employees were engaged in a questionable enterprise whereby they returned products received from unknown manufacturers, or otherwise skimmed from other orders, for credit by arranging to make such returns appear to have originated with certain pharmacies. ERW received a 25%-33% fee for such returns, and the estimated total value of such returns equals almost 1 million.
See, Order and March ROL.
On March 18, 2003, the DEA received a letter from ERW in which ERW states that it had found 39 Quaalude tablets in its controlled substances vault. It appeared to ERW that these tablets had been delivered almost one year earlier, in April, 2002. ERW could not account for the origin of the tablets. Since Quaaludes are a Schedule I controlled substance, which ERW is not authorized to handle, its possession of the tablets alone violated the law. Id.
The St. Louis Field Office recommended that an order to show cause be issued to revoke ERWs registration. Very shortly thereafter, the DEA was again contacted by ERW. According to ERW, on April 2, 2003, employees discovered an entire pallet of controlled substances in the warehouse, where the pallet had sat in and unsecured portion of the warehouse for almost a week. Upon its discovery, the pallet was moved into the controlled cage where ERW employees realized that a significant amount of the controlled substances was missing. Specifically, ERW employees noticed that the pallet contained no MS Contin, although the paperwork indicated that this drug had been included in the shipment, and that the top of the pallet was not completely shrinkwrapped and the top boxes, which were clearly labeled as containing Percocet, appeared to have been cut or opened. After weighing the pallet, ERW employees discovered that it weighed only 349 pounds, although the bill of lading indicated the weight of 420 pounds. ERW's own records indicated a weight of 399. Order, ¶¶ 26, 28.
ERW did not immediately notify DEA. Rather, ERW searched the landfill. It also conducted an inventory of the pallet and realized that, based on the shipping documents, it was missing some 300-plus 100 count bottles of Percocet and 156 100 count bottles of MS Contin. Order, ¶ 26. DEA investigators came to ERW's facilities that same day to conduct an investigation. Subsequently, the box of MS Contin was discovered in the controlled substances vault. As part of the investigation, DEA contacted the shipper of the Percocet to confirm that the pallet contained 1, 744 bottles as indicated on the shipping papers. The shipper also informed DEA that it has specifically telephoned ERW in advance to inform it that the pallet was on its way. Order, ¶ 30.
*1021 Several days later, the Percocet was counted again. At this count, only 6 bottles were missing.... The pallet now weighed 410 pounds. The pallet was weighed without the missing 300 bottles and the weight was again 349, thus indicating that the initial count was accurate and the bottles were in fact originally missing, suggesting that they had been returned. Order, ¶ 31. A polygraph examination was administered to three employees at the direction of ERW. Two of the three failed the examination. Order, ¶ 33.
Based on ERW's background obtained through the August 2001 investigation and the events which occurred subsequent to the closing discussion, the Deputy Administrator determined, in his discretion, that ERW's continued registration would constitute an imminent danger to the public health and safety.
While plaintiff argues that it has taken substantial measures to ensure compliance with the statutory requirements,[5] and further argues that it is entitled to the hearing before the immediate suspension, the Court disagrees. Significant problems exist at ERW. These problems have continued even after Mr. Jappa took over and have continued to involve substantial issues with respect to controlled substances, the very substances which the statutes were enacted to protect the public against. ERWs lax procedures throughout the DEA's investigation establish a trend of carelessness which clearly violate the procedures put into place to avoid the very problems which occurred in March and April, 2003. While ERW made promises to follow the requirements set forth for registered entities, it appears that the promises were not fulfilled. The purpose of the registration requirements is to avoid diversion of controlled substances. With the events which occurred in March and April, the decision to immediately suspend ERWs registration was justified and clearly was made to protect the public from the diversion of the controlled substances. Thus, the likelihood of success on the merits, the interests of the DEA in protecting the public from diversion and the public interest in keeping controlled substances under control all weigh against the issuance of a preliminary injunction. The Deputy Administrator's decision to issue the immediate suspension of ERW's registration was therefore neither arbitrary nor capricious, and therefore will not be overturned. 5 U.S.C. § 706(2)(A).
Plaintiff argues that DEA's actions are unjustified because of its reliance on past events, relying on Norman Bridge Drug Company v. Banner, 529 F.2d 822 (5th Cir. 1976). The Court is unpersuaded by plaintiffs argument and reliance on Norman Bridge. In Norman Bridge, the only violations at issue were remote in time. In the matter before the Court, the prior violations serve as a background to the events which ultimately culminated in the suspension of the registration. The basis upon which the DEA's decision to suspend was an on-going examination of the continued violations prior to and during the decision making process. As such, the actions of the DEA were not an abuse of discretion.

Conclusion
The Court has considered the entire record and the testimony and arguments presented at the hearing on this matter. *1022 Based upon the foregoing analysis, plaintiff has failed to establish that it is entitled to the issuance of a preliminary injunction.
Accordingly,
IT IS HEREBY ORDERED that the Application for Preliminary Injunction, [# 1], is denied.
IT IS FURTHER ORDERED that defendant's Motion to Dismiss, [# 27], is granted.
IT IS FURTHER ORDERED that the Temporary Injunction issued on April 30, 2003, is dissolved.
IT IS FURTHER ORDERED that this matter is dismissed.
A separate Judgment in accordance with this Memorandum and Order is entered this date.
NOTES
[1] The compilation of facts are taken from the Administrative Record submitted in opposition to the Application for Preliminary Injunction, the Affidavits on. file, the testimony presented at the hearing and the record before the Court.
[2] The Court's analysis of the testimony contained in this Order is set forth for the purpose of the Court's discussion of the underlying decision. The Court's decision is based on all the evidence presented and the entire record before the Court.
[3] The Court is mindful that this testimony is hearsay. Throughout the course of the hearing, the Court allowed the parties some latitude with respect to the rule of evidence because of the nature of the hearing.
[4] The DEA conducts investigations of this sort on all registrants on a periodic basis.
[5] Plaintiff has submitted the affidavit of Mr. Jappa in support of its Application for Preliminary Injunction. While this affidavit may provide a basis upon which ERW can support its position before the administrative law judge, this affidavit fails to provide any evidence for this Court's determination of whether the preliminary injunction should issue because of the scope of the Court's review.